## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

KENDALL KELLY, individually and on
behalf of all others similarly situated,                   No. 2:24-cv-01262-WSS

      Plaintiffs,                                                CLASS ACTION


v.

BRIDGE IT, INC.,

      Defendant.

### FIRST AMENDED CLASS ACTION COMPLAINT

Kendall Kelly ("Plaintiff"), individually and on behalf of the class defined below, brings this action against Bridge It, Inc. ("Defendant" or "Brigit"), and alleges as follows:

### NATURE OF THE ACTION

1.    This action concerns a cash advance product that Defendant offers in Pennsylvania.

2.    Defendant charges fees to obtain compensation for offering this product, and those fees, on average, yield APRs of 439%. *See* Center for Responsible Lending, Not Free: The Large Hidden Costs of Small-Dollar Loans Made Through Cash Advance Apps, p. 10 (April 2024), *available at*, https://www.responsiblelending.org/sites/default/files/nodes/files/research-publication/crl-not-free-hidden-costs-apr2024.pdf.

3.    These types of excessive fees make it difficult for consumers to pay their bills, and greatly increase the likelihood that they will overdraft a bank account.

4.    These types of excessive fees also are illegal and greatly exceed the lawful 6% rate established by Pennsylvania law. 41 P.S. § 201(a); 7 P.S. § 6203.A.

5.    Plaintiff brings this action, on behalf of herself and the class defined below, and seeks to recover the unlawful fees that Defendant has charged.

## PARTIES

6.      Kelly is a person residing in Allegheny County, Pennsylvania

7.      Defendant is a technology company headquartered in New York, New York.

## FACTUAL ALLEGATIONS

8.      Defendant advances money to Pennsylvania consumers over the internet through a lending app called "Brigit."

9.      The app provides users with up to $250 in cash advances.

10.     To obtain an advance, users must link a bank account to the app; satisfy proprietary underwriting criteria; and authorize Defendant to automatically debit their linked bank account on payday to repay Defendant's advances and fees.

11.     If Defendant believes it will be unable to deduct an advance from a linked account on payday, Defendant will either refuse to issue the advance, or will issue the advance in an amount that Defendant believes it will be able to debit from the account.

12.     Defendant's underwriting criteria, the requirement that users link bank accounts to Defendant's app, and the requirement that consumers authorize Defendant to deduct its advances and fees from linked bank accounts on payday, has resulted in Defendant obtaining repayment on virtually every advance Defendant issues.

13.     Defendant characterizes its cash advance product as "instant cash."

14.     Defendant claims its credit product allows borrowers to "get cash fast," and that the product can be used to cover "emergencies."

15.     Defendant also claims its consumers can use its credit product to "avoid overdrafts" by advancing money into their accounts right when they need it.

16.     Borrowers must pay a per advance fee to obtain these advertised benefits.

2

17.    This per advance fee ranges from $0.99 to $4.99.

18.    Users must pay this fee to get advances immediately and use Defendant's product for its advertised and intended purpose.

19.    If users do not pay this fee, they obtain an inferior product that provides cash days after it is requested.

20.    Borrowers also are required to pay monthly fees to obtain Defendant's product.

21.    Defendant's monthly fee ranges from $8.99 to $14.99.

22.    The monthly and per advance fees Defendant charges are intended to compensate Defendant for lending money, and far exceed the cost of any ancillary services.

23.    And these fees are costly, yielding triple-digit APRs.

24.    Indeed, the average APR for Defendant's cash advance product is 439%. *See* Center for Responsible Lending, Not Free: The Large Hidden Costs of Small-Dollar Loans Made Through Cash Advance Apps, p. 10 (April 2024), *available at*, https://www.responsiblelending.org/sites/default/files/nodes/files/research-publication/crl-not-free-hidden-costs-apr2024.pdf.

25.    The cash advances that Plaintiff obtained—which were used for personal, family, and/or household purposes—also had triple-digit APRs

26.    For example, Plaintiff obtained numerous $50.00 cash advances, and was charged $0.99 in express fees and $9.99 in monthly fees to obtain these advances.

27.    Plaintiff's repayment schedule on the advances was two weeks or less, which means the advances yielded APRs of 572.63% or more.

28.    This far exceeds the lawful 6% APR limit set by Pennsylvania law. *See Cash Am. Net of Nev., LLC v. Dep't of Banking*, 8 A.3d 282, 285-86 (Pa. 2010) (unlicensed entities, such as Defendant, are "bound by the 6% cap"); *see also* 7 P.S. § 6203.A; 41 P.S. § 201(a).

29.    Indeed, Pennsylvania law specifically prohibits the exact type of "short-term, high-interest-or-fee loans" that Defendant is offering. *See Dep't of Banking v. NCAS of Del., LLC*, 948 A.2d 752, 754 (Pa. 2008).

30.    The Legislature outlawed this type of credit because the high cost of these types of loans leaves holes in borrowers' paychecks, which can create a cycle of debt, where users take out new advances to fill holes created by old advances.  *See, e.g.*, Center for Responsible Lending, A Loan Shark In Your Pocket: The Perils of Earned Wage Advance (Oct. 2024), *available at*, https://www.responsiblelending.org/sites/default/files/nodes/files/research-publication/crl-ewa-loan-shark-oct2024.pdf (detailing reborrowing patterns cash advance apps create); Center for Responsible Lending, Not Free: The Large Hidden Costs of Small-Dollar Loans Made Through Cash Advance Apps, p. 13 (April 2024), *available at*, https://www.responsiblelending.org/sites/default/files/nodes/files/research-publication/crl-not-free-hidden-costs-apr2024.pdf (detailing consumer trapped in reborrowing cycle, who stated, "[i]t doesn't help having to forfeit half or more of my check every payday and then borrow it back"); Paulina Cachero, *Popularity of Apps for Early Paydays Masks Added Risks*, Bloomberg (July 29, 2023), https://www.bloomberg.com/news/articles/2023-06-29/know-the-risks-before-using-cash-advance-apps-like-earnin-dailypay; (detailing consumer who "found himself trapped in a constant loop or borrowing," and felt he had "completely lost control of the situation, with no way to work it out"); Cyrus Farivar, *Millions use Earnin to get cash before payday. Critics say the app is taking advantage of them*, NBC News (July 26, 2019), https://www.nbcnews.com/tech/internet/millions-use-earnin-get-cash-payday-critics-say-app-taking-n1034071 (detailing user of cash advance app who described app as a "vicious cycle" and who "had no money" after paying tips and fees); Sidney Fussell, *The New Payday Lender Looks a Lot Like the Old Payday Lender*, The Atlantic (Dec. 18, 2019), https://www.theatlantic.com/technology/arc

hive/2019/12/online-banking-lending-earnin-tip/603304/ (detailing user of cash advance app who fell into "cycle of get paid and borrow, get paid and borrow").

31.     This cycle of reborrowing erodes the paychecks of borrowers, which prevents them from saving money for their families, and prevents the financially vulnerable from improving their situation and moving out of debt.

32.     This cycle of reborrowing also makes it more likely that consumers will be subject to additional charges or fees, like bank overdraft fees, which further erodes the financial stability of Defendant's userbase. *See, e.g.*, Center for Responsible Lending, Not Free: The Large Hidden Costs of Small-Dollar Loans Made Through Cash Advance Apps, pp. 6-7 (April 2024), *available at*, https://www.responsiblelending.org/sites/default/files/nodes/files/research-publication/crl-not-free-hidden-costs-apr2024.pdf.

## ARBITRATION ALLEGATIONS

33.     For the time period during which Plaintiff used Defendant's app, Defendant did not disclose to its users that they would be required to arbitrate their claims by using Defendant's app, or that they would be required to waive their right to a jury trial.

34.     To use Defendant's app to obtain cash advances, borrowers must download the app to a mobile phone and complete a lengthy sign-up process that includes at least eighteen screens.[1]

35.     On the first screen, users click a "Sign Up" or "Next" button to begin the sign-up process.

36.     On the second screen, users input email addresses and mobile phone numbers, and click a "Text Code" button.

---

[1] A partial example of how the sign-up process looked at some point in 2022 can be found here: https://www.youtube.com/watch?v=EsIDihoNcsI.

37.     The purpose of this screen is to verify contact information.

38.     Clicking the "Text Code" button sends a code to a mobile phone, which users input on a third screen to verify their contact information.

39.     On the fourth screen, users create a unique pin.

40.     On the fifth screen, users verify their pin.

41.     On the sixth screen, users are asked whether they wish to obtain a cash advance or obtain a "credit builder" loan.

42.     Regardless of which option a user selects, a seventh screen appears, and asks users to input their first and last name.

43.     On the eighth screen, users confirm various pieces of information about their bank account and click a "Connect Bank" button.

44.     At times, this screen asked users to confirm that paychecks were deposited into the account, that the account had a positive balance, and that the account was used daily for bills and purchases.

45.     At other times, this screen asked users to confirm the age of the account and the amount of money that was deposited into the account each month.

46.     On the ninth screen, Defendant informs its users that it uses "Plaid" to connect bank accounts and asks users to click a "Continue" button.

47.     On the tenth screen, users choose the financial institution they use.

48.     On the eleventh screen, users choose the type of account that they have with the financial institution and click a "Continue to login" button.

49.     On the twelfth screen, users log in to their financial institution account.

50.    On the thirteenth screen, users choose the specific account that they wish to link, confirm that the account is not a joint account, and click a "Continue" button.

51.    On the fourteenth screen, Defendant analyzes the user's bank account, and asks users to click a "Continue" button when the analysis is complete.

52.    On the fifteenth screen, Defendant informs users of "One last step," and asks users to click a "Let's do it" button.

53.    According to this screen, the last step is needed to determine when users get paid, so Defendant can set repayment dates to match payday.

54.    On the sixteenth screen, users identify deposit sources for accounts—like direct deposits from employers.

55.    On the seventeenth screen, users confirm the dates on which deposits are made and click a "Confirm Details" button.

56.    On the eighteenth screen, users reach the last step of the sign-up process and are instructed to click a "Great!" button to sign-up.

57.    The only way to sign up for Defendant's app is to proceed past all eighteen screens, answer all of the questions that Defendant asks, enter all of the information that Defendant requests and click the "Great!" button on the eighteenth screen.

58.    At no point in this process does Defendant mention arbitration, or the waiver of any constitutional rights, like the right to a jury trial.[2]

---

[2] Defendant previously attempted to force Plaintiff to arbitrate her case by arguing that the second screen of the eighteen-screen sign-up process included a sentence stating "By signing up, you agree to our Terms of Service." *See* Doc. 11-1, ¶¶ 44. According to Defendant, the "Terms of Service" hyperlinked to a contract with an arbitration clause. To the extent Defendant renews its request to arbitrate, Plaintiff intends to argue that this type of "browsewrap" agreement is unenforceable.

## CLASS ACTION ALLEGATIONS

59.    Plaintiff brings this action, individually and on behalf of all others similarly situated, under Rule 23 of the Federal Rules of Civil Procedure.

60.    Plaintiff seeks to certify the following class: "All persons who obtained an advance or loan from Defendant within the statute of limitations while they resided in Pennsylvania."

61.    Fed. R. Civ. P. 23(a)(1): Joinder of the class members is impracticable. The claims of the classes are substantially identical, and the class members request substantially similar relief, which means that centralizing the claims of the class members in a single case is the most manageable litigation method available.

62.    Fed. R. Civ. P. 23(a)(2), 23(b)(3): Plaintiff and the class members share numerous common questions of law and fact that will drive the resolution of the litigation and predominate over any individual issues. For example, there is a single common answer to whether Defendant's advances qualify as "loans," "advances" or "fees" are governed by Pennsylvania usury law. These common questions, and other common questions of law and fact, will predominate over individual questions, to the extent any individual questions exist.

63.    Fed. R. Civ. P. 23(a)(3): Plaintiff's claims are typical of the claims of the members of the class because the claims of Plaintiff and the class are based on the same legal theories and arise from the same conduct.

64.    Fed. R. Civ. P. 23(a)(4): Plaintiff is an adequate representative of the class because the interests of Plaintiff and class members align. Plaintiff will fairly, adequately, and vigorously represent and protect the interests of the class and have no interest antagonistic to the class. Plaintiff retained counsel who are competent and experienced in the prosecution of class action litigation generally and consumer credit and finance litigation specifically.

65.     Fed. R. Civ. P. 23(b)(3): Given the complexity and nature of the issues presented and the relief requested, the expense and time necessary to obtain such relief, and the anticipated recovery and relief Plaintiff and the class members may obtain, the class action mechanism is by far the preferred and most efficient litigation mechanism to adjudicate the claims of Plaintiff and the class members. Additionally, requiring Plaintiff and the class members to file individual actions would impose a crushing burden on the court system and almost certainly lead to inconsistent judgments. Class treatment presents far fewer management difficulties and provides benefits of a single adjudication and economies of scale.[3]

## COUNT I
### Violation of the Loan Interest and Protection Law
### 41 P.S. §§ 101, *et seq.*

66.     Plaintiff and the class members are persons who paid a rate of interest in excess of that provided for by the LIPL and CDCA, and who paid charges prohibited or in excess of those allowed by the LIPL and CDCA.

67.     Defendant collected from Plaintiff and the class members interest in excess of that provided for by the LIPL and CDCA, and charges prohibited or in excess of those allowed by the LIPL and CDCA.

68.     The LIPL provides for, among other things, damages, declaratory and injunctive relief, and attorneys' fees and costs. 41 P.S. §§ 501, 502, 503.

69.     Accordingly, the Court should issue an order: awarding any excess interest, fees, or other charges collected by Defendant; awarding triple the amount of any excess interest, fees, or other charges collected by Defendant; and awarding attorneys' fees and costs.

---

[3] Plaintiff has changed the caption of this case and the citation to the rules of civil procedure to the federal requirements, as this case is now pending in federal court. By doing so, Plaintiff does not concede jurisdiction, that removal was proper, or that this case should not be remanded.

## COUNT II
### Violation of the Consumer Discount Company Act
### 7 P.S. §§ 6201, *et seq.*

70.     Defendant is in the business of negotiating, making, or arranging loans or advances, is not a bank, and is not licensed under any Pennsylvania statute.

71.     Consequently, Defendant cannot charge, collect, contract for, or receive more than 6% combined interest, fees, or other charges on loans or cash advances issued in amounts under $25,000. 7 P.S. § 6203; 41 P.S. § 201(a).

72.     Defendant, however, charged, collected, contracted for, or received interest, fees, or other charges above this amount.

73.     Accordingly, the Court should issue an order: awarding restitution in the amount of any interest, fees, or other amounts that Defendant charged, collected, contracted for, or received in excess of 6%; and awarding attorneys' fees and costs.

## JURY TRIAL DEMANDED

Plaintiff requests a jury trial on all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

a.      An order certifying the proposed class, appointing Plaintiff as representative of the proposed class, and appointing undersigned counsel as counsel for the proposed class;

b.      An order awarding actual, statutory, treble, and all other damages available by law, with pre- and post-judgment interest;

c.      An order providing Plaintiff and the class members restitution for any interest, fees, or other charges that were paid to Defendant and that aggregated in excess of 6%;

d.      An order awarding attorneys' fees and costs;

Respectfully Submitted,

Dated: November 26, 2024      By:   */s/ Kevin Abramowicz*
Kevin Abramowicz
Kevin Tucker
Chandler Steiger
Stephanie Moore
Kayla Conahan
Jessica Liu
**East End Trial Group LLC**
6901 Lynn Way, Suite 503
Pittsburgh, PA 15208
Tel: (412) 223-5740
Fax: (412) 626-7101
kabramowicz@eastendtrialgroup.com
ktucker@eastendtrialgroup.com
csteiger@eastendtrialgroup.com
smoore@eastendtrialgroup.com
kconahan@eastendtrialgroup.com
jliu@eastendtrialgroup.com

*Attorneys for Plaintiffs*